UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
TEXAS SAN ANTONIO DIVISION

CHEYANNE ADAMS, JAMES
ADAMS and WENDY ADAMS,

    Plaintiffs,          Civil Action No.:
                          5:23-cv-01437-XR

V.

ZACHRY INDUSTRIAL, INC.,

    Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

DR. JONATHAN EISENSTAT

MARCH 5, 2026

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

       The oral and videotaped deposition of Dr. Jonathan Eisenstat, produced as a witness at the instance of Mr. Bradley Waters, and duly sworn, was taken in the above-styled and numbered cause on Wednesday, March 4, 2026, from 10:09 a.m. to 11:41 a.m., before Cynthia A. Barnsley, Certified Shorthand Reporter and Notary Public in and for the State of Texas, reported by machine shorthand, at the office of Arnold & Itkin LLP, 6009 Memorial Drive, Houston, TX 77007, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**EXHIBIT 2**

Dr. Jonathan Eisenstat
March 05, 2026

A P P E A R A N C E S

FOR THE PLAINTIFF:

Aileen Christensen
ARNOLD & ITKIN
6009 Memorial Drive
Houston, Texas 77007
TEL: (888) 493-1629
EMAIL: Achristensen@arnolditkin.com
        Jgrinnan@arnolditkin.com


FOR THE DEFENDANT UNITED RENTALS (REMOTELY):

Natalie Colao
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5647
TEL: (303) 244-1800
EMAIL: Ramirez@wtotrial.com
         Colao@wtotrial.com

&

Mark Cooper
NAMAN HOWELL SMITH & LEE, PLLC
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
TEL: (210) 731-6352
EMAIL: Mcooper@namanhowell.com


FOR THE DEFENDANT ZACHRY:

Bradley Waters
ADAMS & REESE
1221 McKinney Street, Suite 4400
Houston, Texas 77010
TEL: (713) 308-0147
EMAIL: Bradley.waters@arlaw.com

Dr. Jonathan Eisenstat
March 05, 2026

FOR THE DEFENDANT INTERNATIONAL PAPER (REMOTELY):

Jose Luzarraga
BUTLER | SNOW
1400 Lavaca Street, Suite 1000
Austin, Texas 78701
TEL: (737) 802-1800
EMAIL: Jose.Luzarraga@butlersnow.com


ALSO PRESENT:

Pamela Longoria, Videographer

Chaney Nichols (remotely)

Dr. Jonathan Eisenstat
March 05, 2026

I N D E X

                                                         PAGE

Appearances....................................... 2

DR. JONATHAN EISENSTAT

Examination by Mr. Waters........................... 5
Examination by Mr. Luzarraga....................... 57
Examination by Ms. Christensen..................... 61
Further examination by Mr. Waters.................. 62

Changes and Signature.............................. 64

Reporter's Certificate............................. 66


            E X H I B I T S

Exhibit 1......................................... 6
         Report & attachments December 2025
Exhibit 2......................................... 32
         Report & attachments January 2026
Exhibit 3......................................... 47
         Updated documents

Dr. Jonathan Eisenstat
March 05, 2026

THE VIDEOGRAPHER:  We are now on the record at 10:09 a.m.

THE COURT REPORTER:  Okay.  Can I have the attorneys announce their appearances for the record, please.

MS. CHRISTENSEN:  Aileen Christensen for plaintiffs.

MR. WATERS:  Bradley Waters for the Zachry defendants.

MR. COOPER:  Mark Cooper for the United Rentals defendants.

MS. COLAO:  Natalie Colao for the United Rentals defendants.

LUZARRAGA:  Jose Luzarraga and Chaney Nichols for International Paper.

(Witness sworn.)

Dr. Jonathan Eisenstat, having been duly sworn by the Certified Court Reporter, testified as follows:

EXAMINATION

BY MR. WATERS:

Q.  Can you tell us your full name, please, sir.

A.  Jonathan Eisenstat.

Q.  Dr. Eisenstat, I'm going to be leading off the questions for you today.  I've marked and placed in

Dr. Jonathan Eisenstat
March 05, 2026

front of you three exhibits.  Exhibit 1 is your December 12, 2025, report with the attachments.  I just want to point out one thing on that, on page 5, and it's on your copy, too, highlighted in mine.  When I tried to print out the report, for whatever reason, it didn't -- and I tried it to a couple of different printers or whatever.  That's the entire statement of Joey Boyd, the handwritten statement dated 8/15/23?

A.  Right.

Q.  I've got a copy of it separately, so I just wanted to explain why it shows up that way.

A.  Got it.  Thanks.

Q.  But otherwise I think the report, Exhibit 1, should be the report in total with the attachments.  Just confirm that with me real quick.

A.  Definitely the report and my CV and my testimony list.

Q.  And then Exhibit 2 that I've marked and put in front of you is your January 26, 2026, report that's 10 pages.  Just confirm that.

MS. CHRISTENSEN:  Feels like when you take an exam and they're like, count pages, now turn it over, does everyone have all the...

A.  Yes.

Q.  (BY MR. WATERS)  And then the third exhibit

Dr. Jonathan Eisenstat
March 05, 2026

that I've marked and placed in front of you is a document entitled Documents Received, starting with Bates stamp Z. Adams 2385, and that goes a few pages. And then starting on Z. Adams 2388, it's your testimony list from what looks to be 2022 through 2026.

A.    Correct.  So this is an updated list from the initial because there's also my testimony list in the initial one.  So I've given a few depositions since that time.

Q.    All right.  Doctor, my understanding is you were requested to do two things in this case.  Number one, examine the cause of Zander Adams death, correct?

A.    Correct.

Q.    And number two, opine if he experienced any conscious pain and suffering, correct?

A.    Correct.

Q.    You weren't requested to opine with regard to the conduct of any of the defendants in this case; is that true?

A.    That's true.

Q.    And, in fact, you have not rendered any opinions, as we sit here today, about the conduct of any of the defendants in this case?

A.    I have not.  That's true.

Q.    And as you sit here today, you don't have any

Dr. Jonathan Eisenstat
March 05, 2026

plans or intentions to do so at trial, fair?

A. That's fair.

Q. All right. Your first opinion is that Mr. Adams died by electrocution, right?

A. Correct.

Q. Do you have an opinion as to how you believe Mr. Adams was electrocuted? In other words, specifically, he was holding this item or piece of equipment, he was touching this, et cetera. Do you understand?

A. Understood. So, no, that's for others to opine to. I mean, obviously, in my report I give a little bit of background, really more for me to be able to look at and say this is where he was, this is what he was doing. But as to the specifics, I'll defer that to Mr. Tobias and others hired by defendants to discuss.

Q. On Exhibit 1, which is your December 12 report, on page 6, kind of the bottom half of it, you've got a section that says The U.S. Department of Labor, OSHA's Investigation Revealed, and it looks like you've cut and pasted kind of a portion from the OSHA investigation materials; is that fair?

A. Yes, sir, that's fair.

Q. And then on the -- if you flip to page 7 at the top part, you've got some additional OSHA materials as I

Dr. Jonathan Eisenstat
March 05, 2026

interpret it, including references to a citation?

A.   Yes, sir.

Q.   Why did you include that information that we see at the top of page 7 about, excuse me, about welding cables with damaged insulation or exposed bare conductors?

A.   Again, it's just background information.  I -- like we already said, I'm not speaking to how he was electrocuted in the sense of the specifics of, you know, like you said, the noninsulated portion versus the, you know, the end of the cable versus whatever.  But every case I look at, I'll have some general background in my report, again, for me to go back.  I'm not saying that that's true or not, but it's more background information for me to refer to.

Q.   Okay.  And so just for me to close the loop on it, the fact that there's references in OSHA materials to bare or exposed cables with insulation -- insulation missing and bare cables exposed, you don't have any evidence or information that that -- that condition caused or contributed to cause Mr. Adams' incident; is that correct?

A.   That's correct.  That's, again, for others to discuss.

Q.   Staying on your December 12 report, Exhibit 1,

Dr. Jonathan Eisenstat
March 05, 2026

if you go to page 10, in the second paragraph, the last sentence that says "in Zander's case"?

A.   Yes, sir.

Q.   It says, "In Zander's case, it was the electrical transmission from the entrance wound through internal organs, such as his heart, and out through the grounded portions of his body that resulted in his death."

A.   Yes, sir.

Q.   Are you opining in this case about what the entrance and exit wounds are for that current path?

A.   So that goes back to what we were just speaking about again.  That's for others to discuss.  It just, again, is a very basic background of how electricity would have to go through the body in general to cause someone's death.  So no, the specifics, I defer that to others.

Q.   You state that the electrical current went from the entrance wound through internal organs such as his heart.  Is it your opinion, Doctor, that Zander Adams sustained ventricular fibrillation?

A.   It is.

Q.   You reference internal organs such as his heart.  Do you have an opinion as to any other internal organs that you believe the electrical current spread

Dr. Jonathan Eisenstat
March 05, 2026

to?

A.   Oh, I'm sure it spread throughout multiple organs, but the concern is he -- the heart, during a certain part of its rhythm, that can lead to that ventricular fibrillation.  So, I mean, it's going to spread through the body along a pathway.  I can't tell you specifically which organs it may have struck.  But really the one for lethality with -- in an acute situation, not somebody that goes to the hospital and languishes there for other reasons, is really the heart.

Q.   On page 10, you cite the plaintiff's expert Jonathan Tobias's report for his opinion on current path, correct?

A.   Yes, sir.

Q.   Did you talk with Jon Tobias about his report or any information contained within his report either prior to you drafting your December 12 report?

A.   Yes, we had a discussion just so I could understand what his opinions were as to the electricity flow and what the voltage was.  But, again, I defer all of those opinions to him, but we did have a discussion about it.

Q.   Did you consider the opinions of any of the other experts in this case, other than Jon Tobias, when it comes to the current path into through and out of

Dr. Jonathan Eisenstat
March 05, 2026

Mr. Adams?

A.  So at the time I wrote this report, obviously, I didn't have defense reports.  So after I wrote my report and reviewed defense reports, and I don't know if I'm saying it right, Loud or Loud (different pronunciation).

Q.  I think it's Loud.

A.  So Mr. Loud's and Dr. Kroll's reports.  I know that there's some difference of opinions as to potentially the route of the electricity through the body, but to me that doesn't matter.  We all agree that it went through the heart, I think.  I think we all agree that heated -- cause ventricular fibrillation.  There are obviously some other disagreements, which I'm sure we'll get to.

So to me the entrance versus the exit, so I did consider -- going back to your question, I did consider them, but whatever the specific path was doesn't matter to me in this case because it led to a lethal arrhythmia.

Q.  Do you have an opinion, Doctor, as to how Zander Adams was positioned the moment that he was electrocuted?

A.  So from my understanding from reading expert reports, as well as -- I just forgot his name -- the

Dr. Jonathan Eisenstat
March 05, 2026

gentleman -- Mr. Boyd talking about how Mr. Adams would have had to be positioned, not specifically, but that he would've had to crouch down in some fashion, and then seeing the inspection photographs and the scene photographs and videos, really I can't say specifically what his positioning was.  But it appears that he had to have gotten down somehow.

Both Mr. Boyd and Dr. Loud's opinions that he was either crouched down or lying down, leaning forward to get to the work where he was doing the work, which was in front of him.

Q.  So for purposes of your evaluation in the case, in terms of his body position, the moment that he would've received that electrical shock, you think it's most reasonable to assume he was either crouching -- crouching down or sitting down?

A.  Well, he would either be crouching down or sitting down or leaning forward or lying down.  I -- the specifics of the exact -- all I can say is he wasn't standing up, and I don't think anybody is saying he was standing up.

But as to whether he was lying down or leaning forward, you know he does have some thermal injuries under his chin, going down along the front of his chest, so he -- he's leaning forward in some fashion

Dr. Jonathan Eisenstat
March 05, 2026

with his chin contact -- and his upper chest contacting something.  So that has to be obviously forward of him.  Whether he's sitting or crouching or kneeling and leaning forward, that I don't think anyone can tell.

Q.   How are you able to rule out that he would've been standing at the time that he first experienced that jolt of electricity?

A.   From my understanding, there's -- he would -- I mean, he wouldn't have been able to reach where he was working so -- if he was standing.  And the electricity is not going to come in until he starts the welding process.  And unless he was standing and he fell, but that would've been a very awkward -- to fall here and then land with something on here, it just -- it makes more sense that he was down and working.

Both -- not just from the experts, Dr. Loud's opinions, but also -- and I have no problem with that part of his opinions -- but also from what Mr. Boyd said, that he would've had to have been down and working.

Q.   Your second opinion is that Mr. Adams experienced conscious pain and suffering, right?

A.   Yes, sir.

Q.   For how long do you believe Mr. Adams experienced conscious pain and suffering?

Dr. Jonathan Eisenstat
March 05, 2026

A.  On the order of seconds.  You know, I can't be specific but at least around 10 to 12 seconds, that's the -- the oxygen stores in the brain that allow an individual to remain conscious when blood flow ceases to the brain.

Q.  So in terms of the lower limit or shortest amount of time you believe Zander Adams would've been conscious after electrocution is 10 seconds?

A.  I think that's right.

MS. CHRISTENSEN:  Objection, form.

A.  I'm sorry.  It's 10, yeah.  If we take that 10 to 12 and we go to the lowest part of it, that would be 10 seconds.

Q.  (BY MR. WATERS)  Okay.  And so the other part of that is, in your opinion, the upper limit or most amount of time you believe, to a reasonable degree of medical certainty, that he would've been conscious is 12 seconds?

MS. CHRISTENSEN:  Object to form.

A.  Well, no, it could've been longer, but I don't have any more evidence to say one way or the other if it was longer than 12 seconds.

Q.  (BY MR. WATERS)  Okay.  So to make sure I'm clear --

A.  Sure.

Dr. Jonathan Eisenstat
March 05, 2026

Q.   -- your testimony -- you would expect your testimony at trial to be that Zander Adams, in your opinion, was conscious for 10 to 12 seconds; is that right?

A.   No.  It would be --

MS. CHRISTENSEN:  Object to form.

A.   I would say at least 10 seconds.

Q.   (BY MR. WATERS)  Okay.

A.   I can't say how much longer than that.

Q.   At least 10 seconds.  I mean, that would suggest it could be 30 seconds or 45 seconds, if you leave it as a minimum of "at least."  You follow?

A.   Yeah.  And that's fair.  And, really, the next point in time we have is when Mr. Boyd goes up and finds him.  So he -- at some point, we know that he has been electrocuted and then in another -- and he has the electrocution marks on his front.  And then at another point, we know that he's leaning back against that gate, right, and he has some burns on his back.

What that timeframe was between those two, I don't know.  And the next point in time is Mr. Boyd coming up and seeing him.  At what point prior to Mr. Boyd coming up and seeing him did Mr. Adams go unconscious and subsequently die, I don't know.

Q.   Based on -- as I just appreciated your

Dr. Jonathan Eisenstat
March 05, 2026

testimony about the 10 to 12 seconds, it's based on the reserve oxygen that the brain has, correct?

A.  Yes, sir.

Q.  You're not aware of any, you know, medical literature that would suggest that it would be more than the 10 to 12 seconds that you've opined on, correct?

MS. CHRISTENSEN:  Object to form.

A.  I see what you're -- I see what you're saying now.  So if his heart truly stopped, went into ventricular fibrillation, and then went into asystole from the electrocution, then I would say definitely 10 to 12 seconds is the timeframe.

But if when he moved back from the frontal contact -- because he had to have moved.  He has these frontal burns.  And from all of the evidence, including Mr. Loud's opinions as to his positioning, and then we know that he's found leaning back against the gate and he has thermal injuries or burns on his back, there's got to be intentional movement from point A to point B. That takes a couple seconds.

So when he lets go is -- does his heart start up again and then he leans back and now the circuit is going again and he becomes electrocuted again, I don't know.  Go ahead.  I'm sorry.

Q.  Yeah.  You reference point A to point B.  What

Dr. Jonathan Eisenstat
March 05, 2026

is the distance, as you appreciate it, from point A to point B?

A.  Oh, it's very short.

Q.  Can you give me in feet or inches or however you can identify it?

A.  I don't recall seeing a measurement for it, so I can't.  What I do know is that it looks -- from the scene photos, it looks less than six feet.  I mean, if someone were to lie down on their stomach, their legs would go through the door, so it's within a couple of feet.

Q.  You've never been to the accident scene, correct?

A.  I have not.  I've just looked at photos and videos.

Q.  Are you able to rule out, Doctor, an event where he would have lost consciousness in less than 10 seconds?  Are there -- have you been able to rule that out to a reasonable degree of medical certainty?

A.  So what I would say is it is more likely than not.  It's 10 to 12 seconds at least.  Is there the possibility it could be shorter?  I mean, there is that possibility but much, much less likely, especially with him moving from one position to the other, that forward to sitting back.  But I would say that with the oxygen

Dr. Jonathan Eisenstat
March 05, 2026

reserves, 10 to 12 seconds is way more likely than less.

Q. When you say it's possible it could be shorter, what facts or information would support it being a shorter period of time than the 10 to 12 seconds?

A. Nothing.

Q. I mean, I know that's your opinion, that there's nothing that you've seen in terms of the case file materials, the things you've investigated, but I'm asking as a general principle. What are the circumstances that would have to occur for somebody to sustain an electrocution and lose consciousness for a period of time less than 10 seconds?

MS. CHRISTENSEN: Object to form.

A. So there would have to be an electrocution that goes right through the brain stem or a much higher voltage, higher amperage. I mean, those would be the main things I would think of.

Q. (BY MR. WATERS) I want to talk -- I probably took this out of order, but I want to make sure I understand, Doctor. Your -- kind of your scientific methodology with regard to ultimately rendering an opinion on conscious pain and suffering of Zander Adams, walk me through what you do as part of your scientific methodology to forensically examine, evaluate and come to that opinion.

Dr. Jonathan Eisenstat
March 05, 2026

A.  Sure.  So, obviously, I start with the information I have from the scene, with voltage and how the individual could have been electrocuted, right. We're not talking about a high-voltage power line here. We're talking about a low-voltage situation.  That's number one.

Number two, then I look at the body and I rule in and rule out causes of death, contributing causes of death, you know, substances, which his toxicology was negative.  But, in general, I'll take all of that into account.

Then I will come up with my cause of death and if there are any contributing causes or not.  And then we look at the scenario and the scene, right.  And as I mentioned in my initial report, there are multiple reasons for why an individual can die from the electrocution.  In this case we've ruled out blunt impact injury.  We've ruled out, in my opinion, any natural cause of death.  We've ruled out substances. We've ruled out -- substances, and what I mean by that is toxicologic substances that could have altered his perception of pain, right, or his awareness.  So there's no opioids, there's no alcohol in his system, et cetera.

Then we looked at the scene itself.  And in this scene he's not found dead, facedown, where he was

Dr. Jonathan Eisenstat
March 05, 2026

working in a small area.  He's got burns on both the front and the back, so he had to have had it in two locations.  The place he's working -- and I understand it's a small platform, but the place he's working is in front.  And as per even Dr. Loud's opinion, he's kneeling or crouching or lying forward -- I don't remember the exact terminology -- working when he gets electrocuted.  This is not a electrocution that's going to blow his body backwards, right.

So from that point, he has to be able to move his body from where he gets electrocuted to sitting back against the gate.  Using that with all the scientific literature about how long a person can stay conscious with ventricular fibrillation, all of that put together indicates to me that Mr. Adams was conscious.  When you're conscious, you're going to experience the pain and suffering that's associated with the burns and the electricity before he ultimately died.

Q.  You said you were able to rule out natural cause of death?

A.  Yes.

Q.  Did you note the autopsy findings were he had an enlarged heart and an enlarged liver?

A.  So I noted that his heart weighed 490 grams.  I don't know the pathologist, but the pathologist used old

Dr. Jonathan Eisenstat
March 05, 2026

literature to say what normal is.  490 grams is still enlarged but not dramatically enlarged.  The average for someone of his height and weight is about 400 grams, plus or minus 40.  So he's slightly enlarged, but his left ventricle is normal thickness; his right ventricle is a normal thickness.  There's no evidence of coronary artery disease, and there was no evidence of any scarring or anything at autopsy.  His liver was not enlarged.  The pathologist said it was enlarged, but that's not an enlarged liver weight.

There's newer literature on body weights.  You know, I don't -- and I don't mean to criticize this pathologist.  Many pathologists -- for years we've been using literature from the Mayo Clinic where we compare normal organ weights or that we use for normal organ weights.  Well, our society has changed since the 70s when that was starting, those articles came out.  So normal weights have gotten larger.

So the long and short of it is he had a slightly enlarged heart, nothing dramatic, no wall thickness, no coronary artery disease, and his liver was not really enlarged.

Q.  Do you disagree with any of the other findings or observations in the autopsy report that were made by the pathologist?

A.   No.

Q.   On page 10 of your December 12 report, you state that the voltage that conveyed to Mr. Adams' body needs to be evaluated to assess mechanism of death and whether or not Mr. Adams experienced conscious pain and suffering, correct?

A.   Correct.

Q.   Have you ever welded?

A.   No.

Q.   Before this case, were you familiar with the specific welder that was being used in this case, the Bobcat 260 welding machine?

A.   I was not.

Q.   Before this case, were you familiar with the -- with TIG welding, which was the specific type of welding that Mr. Adams was doing?

A.   I knew of it but, I mean, I don't know the specific of it.  I'm not a welder.

Q.   What did you do to familiarize yourself, not having any previous knowledge or understanding of the Miller Bobcat 260 machine?  How did you familiarize yourself with that machine and with TIG welding?

A.   So, number one, that's not as important to me as to the machine or anything in the sense that what I was talking about by saying we need to understand the

Dr. Jonathan Eisenstat
March 05, 2026

voltage, et cetera, is from a forensic pathologist, we need to be able to look to see what the current was and what range it falls into: Is it high voltage, low voltage, is the person in a wet environment, in a dry environment to go into impedance, to talk about what type of current the body is going to experience on a range.  The specifics of it, I defer to Mr. Tobias.

Q.  What did you do to determine the voltage that you believe was conveyed to Mr. Adams' body in this incident?

A.  Mr. Tobias' report.

Q.  All right.  And then I think it's a couple pages later in your report you say: The maximum DC volts that Zander would've been exposed to would've been 70 volts, which is considered low voltage.

A.  Yes, sir.

Q.  Where did you -- what did you do to base -- for that information, What did you base that on?

A.  So that comes out of the prior page.  This comes out of the Bobcat manual that shows the highest voltage is 70 volts.

Q.  What do -- so you've used the phrase low voltage, and you believe 70 volts falls within the definition of low voltage?

A.  Yes.

Dr. Jonathan Eisenstat
March 05, 2026

Q.   What was the range of low voltage?

A.   Well, most household voltage goes up to 120 volts.  But when we look from a forensic standpoint, 1000 volts is usually the transition from low to high voltage.

Q.   So high voltage then is anything from a thousand volts and higher, and up?

A.   Yes.

Q.   On page 12, you state, "When evaluating if an individual remains conscious and what they may experience, the amperage within the body should be calculated," correct?

A.   Yes.

Q.   And to do this you use the formula: current equals voltage divided by resistance?

A.   Correct.

Q.   And you note that dry skin offers the highest resistance up to a hundred thousand ohms or more.

A.   Correct.

Q.   Where did you get that number from, what source or sources?

A.   Oh, gosh.  I don't know if that's from one of the forensic pathology textbooks or another article that I've read over the years.  I mean, that's -- gosh, I've been doing this for 20-something years now and that's

Dr. Jonathan Eisenstat
March 05, 2026

from either -- it's from literature that I've read over the years.

Q.  I mean, when you -- when you -- and, I assume, did you prepare the report?

A.  Yes.

Q.  The -- I guess both reports, the December 12, 2025, and January 26, 2026, you actually typed those up and prepared them yourself?

A.  Yes, it was just me.

Q.  Okay.  When you were typing that part, where you get into ohms and things like that, was that just based off the top-of-your-head knowledge that you had?

A.  Yes.  I'm sorry, I didn't mean to interrupt you.  Yes.

Q.  You note that -- you state that wet or broken skin offers lower resistance, as low as a thousand ohms, right?

A.  Yes, sir.

Q.  And again, was that just numbers based on what you recall from reading the literature and textbooks, things like that?

A.  Yes, sir.

Q.  What is included within the scope or meaning of broken skin, just so I'm clear we're communicating?  Do you include scrapes?

Dr. Jonathan Eisenstat
March 05, 2026

A.  Well, scrapes have to -- it can't be just a tiny, little superficial scrape.  You have to have -- I just blanked on the word.  You have to have underneath the epidermis, so underneath that.  The epidermis is really the strong part of our skin, right.  So if the scrape is significant enough that it rips off that top layer, that's all you really need.  Scrape, cut, ulcer, things of that sort.

Q.  You used both the highest voltage output, the 70 volts that we talked about earlier, and both the lower skin resistance and the higher skin resistance numbers, right?

A.  Yes, and as obviously was addressed in my second report, the 53 volts was a typographical error. Should've been 70.

Q.  Yeah, I've got that and I'm not fussing with you about that.  The -- why did you use the lower skin resistance as part of your calculation?

A.  Just to show what the range would've been if the person's skin was wet.  Just basically showing even at the lowest resistance of the skin, that you still have, you know, .07 amperes going through the body.

Q.  You don't have any evidence, do you, sir, that indicates that Zander Adams had wet or broken skin when he was electrocuted?

Dr. Jonathan Eisenstat
March 05, 2026

A.   That's --

MS. CHRISTENSEN:   Object to form.

A.   That's not what I'm trying to imply within this.  I just used it to show the range.  So, you know, I saw different statements within the documents.  I don't remember if it was Mr. -- I don't know why I keep blanking on his name -- Mr. Boyd or there was another coworker.  One of the two of them said that it was really hot and wet in there and that you would break out in sweat.  That's as far as I know.  Other than that, I can't speak to one way or the other.

Q.   (BY MR. WATERS)  And just to be clear, you're not saying one way or the other whether or not Zander Adams had wet or broken skin, right?

A.   That's fair.

Q.   You're just using that as a -- within the range?

A.   That's exactly right.

Q.   Okay.  And so using that range with the wet or broken skin, it's the .070 amperage, right?

A.   Yes.

Q.   Is this .070 amperage or current sufficient to result in ventricular fibrillation?

A.   So it is.  And you have to -- again, these are ranges.  This is not -- and I address this in one of

Dr. Krolll's criticisms of me, that these are ranges, these are not minimums.  And so we are in the general vicinity of what can lead to ventricular fibrillation. .100 amperes from that chart is a range.  It's a generalization of the area where V-fib starts, right. So .07 and .1 is not that far away.  And I'm not saying that .07 is what he received.  I'm just showing the ranges again.  So in that general range, absolutely. And I don't think there's any argument between any of the experts that he went into V-fib.

Q.  Is .07 amperage enough to kill someone?

A.  Well, if you go to ventricular fibrillation, yes.

Q.  Is that based upon any peer-reviewed scientific medical literature, that .07 amperage would be enough to kill someone if it caused them to go into ventricular fibrillation?

A.  I mean, I don't know if that specific number is in there.  But, I mean, the medical literature is filled with cases and articles talking about ventricular fibrillation of all different voltages/amperes.  So, I mean, I don't know if that specific terminology is in there, but it is what it is.  I mean, you take it case by case.

Q.  The table -- the table 1 that you've got on

Dr. Jonathan Eisenstat
March 05, 2026

page 12 of your report where it's got the .1 ventricular fibrillation, so what would be the range, in your opinion, of the current or amperes that would be sufficient enough to trigger ventricular fibrillation?

A.  Well, I would say the average would be -- the average lower level would be about a .1 but, you know, plus or minus.  I don't recall the specifics of what the range is, if this article even discusses the range.  But as said here, examples of physiologic effects related to current, so these are examples, not specific numbers.

Q.  Immediately below that table on page 12, you state, "As electricity contacted his body, Zander would experience significant pain from the burns as well as a sensation of electrical shock emanating from the site of contact."  Right?

A.  Yes.

Q.  For how long do you opine that he would have experienced that pain and sensation?

A.  For those 10 to 12 seconds.

Q.  It continues, that paragraph, "That current would then spread through his body, resulting in muscular contractions and paralysis.  Either of these would've caused Zander to experience chest pain and sensation of impending doom."

Again, just to be clear, the 10 to 12

Dr. Jonathan Eisenstat
March 05, 2026

sec- -- that is -- what you just described there of the current, you know, spreading in his body and causing the contractions and paralysis, that's occurring within the 10 to 12 seconds, right?

A.   Fair.

Q.   Could it have -- could it have occurred within a shorter period of time in your opinion?

A.   Well, he's on -- from my understanding, that whole platform is energized, so while he's conscious in that 10- to 12-second frame, he's going to be experiencing and he also sustained burns, which is extremely painful because they're second-degree burns. Focally third-degree, but majority second-degree, so he would be experiencing that.

As far as would it be shorter, that goes back to that same question asked earlier. I mean, nothing is out of the realm of possibilities. But more likely than not, it wouldn't have been shorter.

Q.   On the top of page 13, you say, "Ultimately, there would be decreased blood flow and oxygen to his brain and resultant death. During this time he would still be conscious and experiencing the above described symptoms."

Again, I want to clarify what you mean by "ultimately" and "during this time." You're still

Dr. Jonathan Eisenstat
March 05, 2026

contemplating what you just described there within the 10 to 12 seconds, right?

A.   Yes, sir.

Q.   You saw nothing in any of the medical documentation or otherwise, statements, that sort of thing, to indicate that once Zander Adams was first discovered nonresponsive and unconscious that he ever regained consciousness, right?

A.   That's correct.

Q.   I want to put Exhibit 1 aside and look at Exhibit 2, which is your January 26 report.  Are we okay on time?

A.   Oh, yeah, we're great.

Q.   You know how this works?

A.   I do.

Q.   If you get to a point where you need a break, just let me know.

A.   I will.

MS. CHRISTENSEN:  Maybe we could take just five minutes for me if that's okay.

MR. WATERS:  Yes, we're starting a new report so that's fine.

MS. CHRISTENSEN:  Sorry.

THE VIDEOGRAPHER:  Off the record at 10:47.

(Recess taken.)

Dr. Jonathan Eisenstat
March 05, 2026

THE VIDEOGRAPHER: We are back on the record at 10:56.

Q. (BY MR. WATERS) Doctor, we're back from a short break. Are you ready to continue?

A. Yes, sir.

Q. Okay. We had put aside your Exhibit 1, December 12 report, and I wanted to ask you about your January 26 report that's marked Exhibit 2, okay?

A. Okay.

Q. As I understand sort of how this was set up, you got some additional materials, including the defendant's expert designations and reports, and you were addressing -- you noted some of the comments that either Dr. Kroll or Dr. Loud had indicated, and then you responded to them in italics; is that fair?

A. That's exactly right.

Q. That's how the setup of Exhibit 2 is?

A. Yes, sir.

Q. All right. And so your Kroll opinions with your responses in italics starts on page 2, right?

A. Yes, sir.

Q. So I want to take you to page 4 where it starts -- it says, "Dr. Eisenstat's opinions can be interpreted three different ways, so we take them sequitur," and then you start with number 1. You see that?

Dr. Jonathan Eisenstat
March 05, 2026

A.  Yes, sir, I do.

Q.  Okay.  I wanted to ask you about the, "When an electrical current affects the heart in electrocution, the results are tragic and lethal.  They are also very simple.  The result is ventricular fibrillation.  This causes a loss of consciousness in 3 seconds in someone upright."  You see that?

A.  I see that.

Q.  That's the statement from Dr. Kroll.

A.  Correct.

Q.  And then you address it below in italics, right?

A.  Correct.

Q.  Do you agree or disagree that ventricular fibrillation causes a loss of consciousness in 3 seconds in someone upright?

A.  I disagree.

Q.  Okay.  Why -- what's the basis for that?

A.  All the articles that I supplied that show that an individual can be conscious for at least 10 to 12 seconds, if not longer, and there's some articles in here that I've supplied where an individual is in ventricular fibrillation and talking to doctors in a recovery room after surgery.

Q.  When someone is experiencing ventricular

Dr. Jonathan Eisenstat
March 05, 2026

fibrillation, in your opinion, does it matter whether the person is upright or sitting or laying down in terms of how long it would take to lose consciousness?

A.  Well, that would -- you would think that would have to do with the blood flow to the brain with the pressure.  So if someone's standing up, I mean, there's the potential that it would decrease the amount of blood going to the brain, but that does not negate all of the literature and all of the studies that show you have 10 to 12 seconds of oxygen reserves in your brain.  So that's not going to change the time.

Q.  All right.  Let me see if I can break that down a little bit and see what we can agree or not on.  You would agree that the amount of oxygen in the brain is influenced by whether you are sitting or standing, primarily due to the impact of gravity on blood flow and pressure; do you agree or disagree with that?

A.  I'm sorry.  Can you say it one more time?

Q.  I sure can.  Do you agree or disagree that the amount of oxygen in the brain is influenced by whether you are sitting or standing, primarily due to the impact of gravity on blood flow and pressure?

A.  Not if our heart is pumping normally.  I mean, you and I are talking and we're conscious, and we're sitting upright and gravity would be pushing down.  Now,

if the heart has stopped then, yes, there would be difference.  There could be difference with gravity not allowing as much blood.  But as far as oxygen, the oxygen that's in the brain is in the brain.  The amount of oxygen getting to the brain because of a change in the blood flow, that may be altered.  But the oxygen stores in your brain are not affected by gravity.

Q.  Okay.  So in your opinion, somebody would not have a higher oxygen reserve in the brain if they're laying down as opposed to standing up?

A.  Not at the -- not at the beginning of that process, right.  So if, let's say -- let's say I'm sitting here right now or I'm standing right now and I get electrocuted.  My oxygen reserve in my brain at the time I get electrocuted would be exactly the same as if I were laying on the floor and got electrocuted.  Now, the blood flow, the pressures of blood flow supplying new oxygen to the brain may be altered due to gravity if you're standing versus laying down.

Q.  Okay.  So let me see -- let me see if I can put it in specific context of this incident.

A.  Sure.

Q.  In your opinion, if -- there's no difference of whether -- of conscious pain and suffering for Zander Adams, how much reserve oxygen he had in his brain at

Dr. Jonathan Eisenstat
March 05, 2026

the time that he was electrocuted if he's standing versus if he's crouching or laying down.

A.   That's a different question because that took it outside -- the first question I thought you were asking about -- and maybe I misunderstood, but I thought you were talking about the oxygen that is in your brain at the time of the incident.  Those be the same no matter where you are.  Now, if you're standing versus laying down, that's not going to change the 10 to 12 seconds from the time of the electrocution going through the heart causing the fibrillation.  It's not going to change the 10 to 12 seconds there.  It may change the potential for causing it to be longer, the consciousness, but it's not going to change that 10 to 12 seconds at least.

Q.   Okay.  So to make sure, you know, the Denzel Washington, tell it to me like I'm a 3rd grader, I'm going to try that.  As I understand what you're saying, the reserve oxygen in the brain is not impacted or altered whether you're -- depending on how you're positioned, standing, kneeling, laying down.

A.   The reserve, that's correct.

Q.   And the reserve is what you're basing the 10 to 12 seconds of consciousness on, right?

A.   Right, and that's why if you or I go into

Dr. Jonathan Eisenstat
March 05, 2026

ventricular fibrillation right now, we can -- you'll be conscious for 10 to 12 more seconds at least, whether we're lying down or standing up.

Q.  When Dr. Kroll writes that this causes a loss of consciousness in 3 seconds in someone upright, have you seen case studies or instances where somebody that is put in ventricular fibrillation while standing upright has lost consciousness in as little as 3 seconds?

A.  So, I mean, I've seen where sudden death has been called as within a couple of seconds, but that's not under -- I'm trying to see how to explain that in the Denzel fashion.

Q.  I've thrown you off.

A.  No, you haven't thrown me off.  So the question is you have to know when the ventricular fibrillation actually starts, right, to know that that's the starting point of the process.  So I would have to look at what literature is being described or if you have an article that says within 3 seconds this person has gone unconscious after ventricular fibrillation, to see if that article is addressing the true onset of the V-fib, if that makes sense.

Q.  On -- staying on page 4, now looking at the italicized part of your response, you cite -- it's the

Dr. Jonathan Eisenstat
March 05, 2026

sentence that you quote from that -- ultimately ends up with the footnote 3, the DiMaio report.

A.   Yes, sir.

Q.   Where you start, "In low-voltage electrocution with VF, consciousness may not be lost immediately." Then it says, "In fact, it is very common for the individual receiving a fatal electric shock not to lose consciousness but to yell out or state that he just 'burned' himself prior to collapse."

A.   Yes, sir.

Q.   That's from the DiMaio study that you're quoting?

A.   That's from the DiMaio textbook.  It's a forensic pathology textbook.

Q.   Textbook, I'm sorry.  You would agree there's no evidence in this case that Zander Adams yelled out prior to him being found?

MS. CHRISTENSEN:  Object to form.

A.   So I'll say that no one said that he yelled, but you have to take the circumstances as they are.  And from watching the inspection videos, it's very loud in that area and Mr. -- I'm always blanking on his name.

MS. CHRISTENSEN:  Mr. Boyd.

Q.   (BY MR. WATERS)  Mr. Boyd.

A.   Thank you.  I don't know why and I apologize,

Mr. Boyd.

Mr. Boyd was not standing right next to him, but still you have the machinery making noise, and then you have the actual Bobcat making noise as well. So I agree no one heard him scream. Number one, that doesn't mean he didn't scream; and, number two, they don't always scream. Even in DiMaio it says it's common but that doesn't mean it always happens.

Q. You would agree at this point, based upon the information that we have, it would be speculation as to whether or not Zander Adams yelled out or spoke anything after he was being electrocuted, right?

MS. CHRISTENSEN: Object to form.

A. I think it would be speculation if I said that he yelled out loud enough that someone could've heard. I guess it would be speculation as well if I said that he did or did not make noise, because I don't know if he did or did not make noise.

Q. (BY MR. WATERS) Right. I mean, what Joey Boyd indicated in his handwritten statement, the hours or so after the incident occurred, was that what alerted him to -- to pay attention, see something, was not seeing the arc flash, correct?

A. Correct. Yes, sir.

Q. And that's what prompted him to check on

Dr. Jonathan Eisenstat
March 05, 2026

Mr. Adams, right?

A.   That's correct.

Q.   On page 5 of your January 26 report, you say -- this is part of the top, the italicized part, so this is you responding to some comment or opinion.  You say in kind of the middle of that top paragraph, "In a letter to the editor of Resuscitation" with the footnote 6, you're referring to the Hoppenfield report or Hoppenfield study?

A.   To their letter to the editor, yes.

Q.   Okay.  You say, "In a letter to the editor in Resuscitation, a group of medical providers 'witnessed two cardiac arrests in patients who remained conscious enough to deter resuscitation despite being pulseless with ventricular fibrillation.'  The second case in this letter to the editor involved a 51-year-old man who developed witness ventricular fibrillation in the PACU. Several anesthesiologists immediately arrived and the patient remained conscious and responsive for about 30 seconds but without palpable pulses."

And then it continues on.

A.   Yes, sir.

Q.   You would agree that those two cases, or the instances involving those two patients that's being reported, both of those patients were getting CPR or

Dr. Jonathan Eisenstat
March 05, 2026

chest compressions until they could get defibrillated, right?

A. I agree.

Q. And you would agree that both patients are getting expert medical attention in a hospital setting, right?

A. Right.

Q. Okay. Mr. Adams -- there's no evidence that Mr. Adams got any type of CPR while he was -- before he lost consciousness, right?

A. Oh, I agree with that.

Q. And so you say that the -- the last part, "patient remained conscious and responsive for about 30 seconds." You're not using that to suggest that Mr. Adams was conscious for 30 seconds, are you?

A. No, sir. I'm just -- that whole section is really pointing out the literature that shows that his refuting what Dr. Kroll is saying, that it's an immediate death, even though he -- Dr. Kroll sort of contradicts himself, because 3 seconds is not immediate. But that's -- I'm not giving these to say a timeframe. I'm just showing that ventricular fibrillation does not mean an immediate death.

Q. Right. But in case of the Resuscitation letter to the editor that's attributed to Hoppenfield, I mean,

Dr. Jonathan Eisenstat
March 05, 2026

that's a much different set of facts and circumstances in a location than where Mr. Adams was and what was occurring with him, right?

A.   Oh, the circumstances are different, absolutely.  But what -- what is important about this is that these are medical providers who know what ventricular fibrillation is, and these patients are alert and conscious and saying, no, don't resuscitate me, for one of them.  So it's really just -- it's I'm not equating these cases to try to give a timeframe or a specific timeframe or talking about resuscitation.  I am using these as proof that ventricular fibrillation does not equate to sudden death.

Q.   The last part of that same section, the italicized section says, "A victim of low-voltage electrocution may suddenly arch backwards, yell loudly, or state that they were just shocked and take several steps before collapsing with ventricular fibrillation."

Doctor, again, we don't have any evidence in this particular case that Zander Adams did any of those things prior to losing consciousness, meaning suddenly arching backwards, yelling loudly, stating they were just shocked or taking several steps before collapsing; is that fair?

MS. CHRISTENSEN:  Object to form.

Dr. Jonathan Eisenstat
March 05, 2026

A.  So as I stated earlier, he had to move from the front part of that platform to the back, so that's a movement.  But as far as a number of steps or yelling loudly where Mr. Boyd could hear him, I agree that we don't have evidence that that part happened.

Q.  (BY MR. WATERS)  On page 7 of your January 26 report, in this kind of middle of the page, again the italicized section that you're writing in response, you talk about, "Over my approximately 20 years of investigating deaths, I viewed videos of individuals being electrocuted and have reviewed witness statements and a number of electrocution deaths.  These are not research projects in a laboratory but real-life instances where I have seen and reviewed documents where individuals are conscious after the electrical injury and subsequently collapse and die, as I believe what happened in this case with Zander Adams."

Can you give me some information or detail about what instance, real-life instances, you're contemplating or referring to when you wrote that?

A.  Absolutely.  So I can't give you specifics because they were as a -- like, you know, names or things like that.  But the generalization is I've seen videos, which is, you know, part of the job, I guess.  It's a little depressing but have seen videos of

individuals doing what's called fractal wood burning, which is where you take -- you have a piece of wood and you make -- it's actually beautiful but very dangerous. You make these beautiful patterns by burning them with electrodes.  Very dangerous because there's a high instance of -- not a high instance, but I should say there's a chance of electrocution.  And some people videotape themselves doing that, I guess maybe to try to sell it.  So I've seen people electrocuted like that. You hear them go (descriptive noise).  That's as loud as they need to get, walk to the other side of the room, and collapse.

I've seen prisoners in -- or one prisoner in a jail cell who was using a toilet in the prison; and, you know, the toilets are metallic and the wall was metallic, and he reached to get the toilet paper and missed the toilet paper thing, touched the wall and there had -- which we found out later, there was loose wires behind it.  Got electrocuted.  Obviously, we have the circuit, and he doesn't just collapse; he sits there and he looks and then he collapses.

I can't tell you -- now, not all of these now are autopsies that I did, but they may have been done by doctors who worked for me when I was the chief medical examiner for the State of Georgia.  Photographs

of scenes where an individual was doing some kind of work at their own residence and they're electrocuted, we see the burns on their fingers, maybe on their toes, depending on the shoe that they're wearing, et cetera, to show the path of electrocution.  And the only way -- the only place they could've been electrocuted was on the other side of the room.  So they had to get from one side to the other.  That shows consciousness.

Q.  Let me stop you there --

A.  Sure.

Q.  -- if you don't mind.  Is the point that you're making here again to refute the position that an electrocution like this would result in immediate loss of consciousness?

A.  So it's in response to -- I think it's in a response to Dr. Kroll saying that I don't understand the fundamentals, and I'm not going to get into some of the other things I think are a little outlandish in his report.  But, yes, that I do understand the fundamentals despite his criticism of me, and that people do not die immediate -- that ventricular fibrillation does not equate to an immediate death.

Q.  Okay.  In other words, you're not using these specific instances as anecdotal evidence to support a period of time, a specific period of time that Zander

Dr. Jonathan Eisenstat
March 05, 2026

Adams was conscious, right?

A.  Well, to -- I think it's a two-part answer. One is I'm using it to show that these individuals have a period of consciousness after the electrocution.  I'm not using them to say that Zander would've been conscious for 10 seconds versus 20 seconds.  I'm not getting that specific.  But it's to show that I understand the fundamentals and that ventricular fibrillation -- that he did not die like that (witness snaps fingers).

Q.  Okay.  You can put that Exhibit 2 aside, and then let me have you look at Exhibit 3 that we marked earlier, which is the documents received, which is an update from what was referenced in your original report, and maybe even your second report, and then your updated case testimony list.

Does the documents received, the three pages of -- first three pages of Exhibit 3, does this outline the sum total of the documents that you've received in this case?

A.  Yes, sir.

Q.  Okay.  And did you actually review all of the documentation and information that's outlined in this table that spans three pages?

A.  I know, it's crazy, it's a lot.  So I will say

Dr. Jonathan Eisenstat
March 05, 2026

this.  I opened every single document.  When I saw like insurance documents or things that have nothing to do with my opinions, I skimmed through those quickly.  The documents that were important to me I definitely read word by word.  So I put eyes on everything, but I didn't read every word of every document.

Q.  Included among this list are depositions.  Did you read all of the deposition testimony that was available for you and provided to you in this case?

A.  I did.  There is -- there are some depositions. I believe they were like corporate reps that I skimmed through quicker than, obviously, the deposition of Mr. Adams' mother and wife.  Those I read a little more in depth.  So I did read them all but at varying intensities, I guess.

Q.  Have you ever met or spoken with Zander Adams's wife, Cheyanne Adams?

A.  No, sir.

Q.  Have you met or spoken with Zander Adams's parents, James and Wendy Adams?

A.  No.

Q.  On your testimony list, as I understand it, this is current from 2022 up through, I guess, February 27th of 2026?  That's the last deposition date that I see on the last page.

Dr. Jonathan Eisenstat
March 05, 2026

A.   So I have given a few more, I believe one or two more depositions this week and last week.  So I think maybe just one more deposition.

Q.   On average, Doctor, about how many times -- let me start over.  You ready?

A.   Yes, I am.

Q.   Okay.  Do you -- how much of your time do you spend doing expert witness, you know, retained testifying work versus some other type of work?

A.   Sure.  So I'll just -- I'll give a summary of everything.  So I do autopsies for two local hospitals in the Atlanta area, Emory Saint Joseph's and Emory Johns Creek.  They're both part of the Emory University health system.  I probably average about one autopsy a month for them.

I do autopsies for one metro Atlanta medical examiner's office that used to be once a week.  They hired somebody so now I assist them once a month.  And then I do autopsies for the New York City medical examiner's office.  I go up there about once every six weeks.  And I probably average around 10 autopsies each time I go up there, about 5 external exams, and about maybe 5 to 10 just investigative reviews, and then signing the death certificates.

Then I do private autopsies for families,

Dr. Jonathan Eisenstat
March 05, 2026

so that doesn't have to do with consulting medical-legal work.  And then I do the medical-legal work or consulting work.  It's probably about 80, 85 percent consulting work, 15 to 20 percent other work.

Q.  In connection with your medical-legal work where you're retained and designated as a testifying expert, to your knowledge, has a court ever excluded any of your opinions or testimony?

A.  They have not.

Q.  Have you ever had any portion of your opinions or conclusions limited or excluded by a court?

A.  So I was limited once many years ago in the state of Georgia where I live in Macon.

Q.  What was the -- what was the circumstance behind the court limiting your testimony in that case?

A.  Sure.  So it was a -- I'm going to make a big case very limited here.  It was a case of a gentleman who had metastatic kidney cancer.  He underwent treatment.  All of the kidney cancer was gone.  It was proven by radiology.  There was basically no lesions anywhere else.  Then this -- it was a premises liability security case.  I'm not a lawyer, so I don't know all the legalese.  But he was in a Wal-Mart parking lot.  He was assaulted and shot with a shotgun, went to the hospital.  Multiple surgeries, multiple blood

Dr. Jonathan Eisenstat
March 05, 2026

transfusions, and his tumor reappeared.

There's -- at the time there was a body of literature, and now there's even a bigger body of literature, that talks about reemergence of dormant tumor cells as a result of systemic trauma from blood transfusions, surgeries, et cetera.  The judge at the time felt that there wasn't enough literature to support that conclusion, so he limited me and two of the world's leading researchers on that topic.  I was allowed to talk about the cause of death, but the judge did not allow me to link the shotgun wound to the reemergence of the tumor cells.

Q.  Have you ever had any of your opinions or conclusions regarding conscious pain and suffering excluded or limited in any way by any court?

A.  No.  I've been challenged a number of times, and every court has denied those challenges.

Q.  How long have you been working with the Arnold & Itkin law firm?

A.  I would say the first time they contacted me maybe around 10 or 15 years ago.

Q.  Have you -- have you worked fairly consistently with the Arnold & Itkin lawyers from when you were first contacted that 10 or 15 years ago?

MS. CHRISTENSEN:  Object to form.

Dr. Jonathan Eisenstat
March 05, 2026

A.   I mean, I don't know how many cases per year they have sent me, but when I first started I was accepting any cases.  Now I've sort of slowed down in the sense of accepting cases just because I'm too busy, and I've really kept it at firms that I've already worked with in the past.  So, I mean, if Arnold & Itkin calls me -- there have been a few cases where I've told them that I don't have the time, and so they've found somebody else.  But if I have the time, I will take their case.

Q.   In addition to this case, how many other cases are you currently doing medical-legal work for the Arnold & Itkin law firm?

A.   That's hard to say because I don't know what's active and what isn't sometimes.  I will say that I probably have about maybe 10 cases right now.  I maybe have about 3 or 4 cases -- maybe 3 cases that I have documents to review for Arnold & Itkin.  Maybe a total of 10 cases that I know are probably still active.  But I don't know where they are statuswise.  I think that's the best estimate I can give.

Q.   Okay.  Do you have a sense or an estimate of, in total, about how many cases you've worked on for the Arnold & Itkin law firm over the years?

A.   Sure.  I mean, if we say maybe about 10 a year,

so if we say 10 years, it's about a hundred -- fifteen years, about a hundred and fifty.

Q.   Okay.   I just -- you can put aside Exhibit 3. Going back quickly to Exhibit 1, you've got your CV attached to it kind of I think right after the body of your report, so around page 14 or so.

A.   Yes, sir.

Q.   I just want to have you confirm that this -- it's 12 -- it spans 12 pages.   Is this -- is this your current version of your CV?

A.   No, I'm -- I'm a little -- I mean, there's not great differences, but I think maybe they accidentally sent you an old one.   My newest was revised in January -- wait, we're in March.   It was revised in February of this year.   And, I mean, I'm happy to tell you what the difference is, not much.

Q.   Yeah, I mean, is there anything material that stands out to you?

A.   Well, I mean, I don't think the New York City medical examiner would be on this one, and it should be. I'm working for them now.

Q.   Do you -- I'm sorry to interrupt.   What vintage or what year is this CV that was attached as part of your report?

A.   Oh, if you go to the last page, which is --

Dr. Jonathan Eisenstat
March 05, 2026

Q.  Oh, revised July 2025?

A.  Yes, sir.

Q.  Okay.  So this is as of July 2025?

A.  Yes, sir.

Q.  Okay.  I'm sorry, didn't mean to interrupt you.

A.  No.

Q.  You were saying -- so this won't show the work you're doing as part of the New York medical examiner's office?

A.  Right, it doesn't look like that's on here.  Excuse me.  And I think the -- let's see if -- okay, that's there.  I mean -- oh, let's see if there's one publication that maybe needed to go on here.  (Speaking sotto voce).  No, I think everything else is pretty much the same.

Q.  The last page of -- that's attached to your December 12 report, Exhibit 1, is a fee schedule?

A.  Yes.

Q.  Just want to confirm, is this fee schedule accurate enough and up-to-date in terms of the fees that you're charging, hourly rates, et cetera, for the work you're doing in this case?

A.  Yes, sir.

Q.  Do you know about how much you've charged for your work in this case so far?

Dr. Jonathan Eisenstat
March 05, 2026

A.  Well, you can see there were a lot of documents, so I don't know off the top of my head, but I'm sure it's probably at least 20 hours.  I mean, that's easy for me to find in my computer.  I know that, you know, I -- my prep alone for the deposition was 4 hours.  So it's probably more than 20 hours total.

Q.  Do you know how much you've been paid so far?

A.  I -- I don't.  I mean, I would assume it's somewhere in the area of around 10,000 because that would be about 15 hours, and I have about -- I have a lot more work that I have not invoiced yet.

Q.  I know you told me you've never been to the International Paper mill there in Mansfield, Louisiana, right?

A.  That's correct.

Q.  Did you -- there been -- so there was a site visit among the parties and experts.  Then there was an equipment inspection that happened later.  Did you attend any of the equipment inspections that have happened in this case?

A.  No, sir, yeah.

Q.  In connection with getting ready for today specifically, did you speak with -- with John Tobias or any of the other experts in the case?

A.  I spoke to Mr. Tobias real briefly because I

Dr. Jonathan Eisenstat
March 05, 2026

had a question about the platform at the top of the steps, you know, just specifically because none of the photographs really pointed out where the -- the -- his work would've been.  Because you see the steps come up, the platform, and then there's some more platform over here.  And so I just wanted a little more specifics on where the actual work was being done, and that was it.

Q.   When did -- when did that discussion happen?

A.   This morning.

Q.   Was he able to provide you the information that you were asking for?

A.   He was.

Q.   Didn't speak with any other experts in connection with getting ready for today?

A.   I did speak with one more, and this was also this morning, and I don't -- Mr. Gibson, I think.  And it was same question I had and same answer I got as to, you know, where the work was being performed.

Q.   So what did -- on that point, what did you find out about where the information -- where the work was being performed that you were trying to find out?

A.   Right, so you go up the ladder or the steps, you have the gate, you have the small platform, and the work was being done forward of that.  And that's really all I wanted to know.  I wanted to make sure that -- you

Dr. Jonathan Eisenstat
March 05, 2026

know, and that's what I had assumed.  But with the photographs of where stuff was on the ground, I just wanted to make sure it wasn't over on that longer catwalk area.  And that was it.

Q.  And again, we talked about it in terms of distance between point A to point B, the area where you got some clarification about where the work was being done relative to that gate that's at the top of the stairs where he was found unresponsive, you don't know as you sit here today what that distance is?

A.  The exact measurement, I do not.

Q.  Do you have an approximation that you're using as part of your opinions in the case?

A.  No, just from visualization.  I know it's probably less than six feet but nothing more than that.

Q.  Dr. Eisenstat, I appreciate your time with me. I'm going to let some of these other lawyers ask questions for you.

MR. WATERS:  I'll pass the witness.

THE WITNESS:  Thank you.

EXAMINATION

BY MR. LUZARRAGA:

Q.  Dr. Eisenstat, my name's Jose Luzarraga, and I represent International Paper.  I just got a couple of questions for you.

Dr. Jonathan Eisenstat
March 05, 2026

A.  Yes, sir.

Q.  On that CV that we were looking at, you've got listed there your past committee work, journals, book chapters, you know, all the peer-reviewed continuing education, conference presentation.  Are any of those presentations or things that you have written in the past, do any of them specifically relate to analysis of electrocution?

A.  I don't think so.

Q.  And earlier you were asked about -- you know, and obviously you've worked on other electrocution situation.  Can you give us kind of a bracket of how many would be similar to this one where we're talking, about, you know, what you classified as low voltage?

A.  Sure.  So, I mean, I would say probably that I personally worked on maybe 10 to 15 that I've been in the medical examiner's office when the cases were done.  I would probably put on another 15 to 20 over my entire career.

Q.  And earlier you were talking about how, you know, you've hypothesized that Mr. Adams must've moved at some point during the incident because he got burns on both sides of his body, right?  He's got some to the front and some to the back.  Is there any way of knowing whether he's conscious between those two when he was

touched in the front and touched in the back?

A.  So it's not just touched in the front and touched in the back.  It's also from the historical information of where he was working and where he was found.  And so from having reviewed the reports of both plaintiff and defense experts, it seems more likely that he's leaning forward, whether he be kneeling or crouching or whatever, but leaning forward doing the work, especially with, you know, some of the burns he had.

So if you get electrocuted, you're in this kind of situation -- not a high voltage that could potentially, you know, throw your body and you go unconscious immediately -- you're going to fall face forward.  So he needs to get from that forward position back to the sitting and leaning against the back where that gate is.  That's a conscious movement.  So he's conscious during that time.  That's my opinion, is that he's conscious during that time.

Q.  And is it possible that that could be -- you know, it seemed like in the literature there were things, and you had a table about kind of muscle contracture and that kind of thing.  Could that be what's causing him to move that's not conscious?

A.  No, so the muscle contracting -- contractures

Dr. Jonathan Eisenstat
March 05, 2026

or contracting, that's the hold-on phenomenon where you hold on.  And so you're going to keep -- as long as you're holding on, you're going to get electrocuted. You're not when you -- when you let go, it's not that you're contracting and it's going to move you back.  So I -- I don't -- I don't see that being the case here.

Q.  All right, sir.  I appreciate your time.  I'm going to -- oh, one more question on that.

You mentioned -- you know, we said that you've got an updated CV since July of '25, and you said something about another publication.  Is that new publication, does it have anything to do with electrocution?

A.  I'm sorry.  I said I think there may be one, and I looked and there's not another one.

Q.  Okay.

A.  So no.

Q.  All right, great.  Thank you.

MR. LUZARRAGA:  I'll pass the witness.

MS. CHRISTENSEN:  Anything from anyone else on Zoom?

MR. COOPER:  This is Mark Cooper on behalf of United Rentals.  We'll reserve our questions until the time of trial.

MS. CHRISTENSEN:  Okay.  Do you have --

Dr. Jonathan Eisenstat
March 05, 2026

MR. WATERS:  I don't have anything further.

MS. CHRISTENSEN:  Okay.  I just have a couple of questions for you.

THE WITNESS:  Okay.

EXAMINATION

BY MS. CHRISTENSEN:

Q.  So you've talked a lot today about this 10-to-12-second timeframe.  Can you clarify what kind of starts the clock on that or what is that period referring to?

A.  That's from the onset of ventricular fibrillation.  So and that -- we were having that discussion earlier.  It's not what's leading up, so I don't know what, you know, he was doing.  I don't know what was happening.  I mean, I know what he was doing for work.  But what I mean is when I talk about that 10 to 12 seconds, that's from the moment the electricity goes through his heart leading to ventricular fibrillation.  Yeah, that's the easiest way.  It's not if he was experiencing anything -- it's not from anything prior to the electricity going through the heart.  It's from the time the electricity puts his heart into V-fib going forward.

Q.  Okay.  So if I'm understanding correctly, you're saying that period is certain for your opinions

for conscious pain and suffering and the other things he was experiencing.  But are you ruling out conscious pain and suffering, fear, distress, that type of thing, prior to the fibrillation?

MR. COOPER:  Objection, form.

A.  Yeah, the 10 to 12 seconds is the ventricular fibrillation forward.  Could he have experienced some type of pain and suffering before, if he got electrocuted before and then it led to the V-fib, I mean, he could.  But that would not be involved in that 10 to 12 seconds.  That would be prior to that.

Q.  (BY MS. CHRISTENSEN)  Understood.  Thank you.

MS. CHRSITENSEN:  We'll reserve the rest.

(Discussion off the record.)

MR. WATERS:  I'm going to have some follow-ups.

FURTHER EXAMINATION

BY MR. WATERS:

Q.  Dr. Eisenstat, are you -- are you opining to a reasonable degree of medical certainty or probability that Zander Adams did experience some type of conscious pain and suffering prior to the onset of ventricular fibrillation?

A.  No, I can't speak to that one way or the other.

Q.  Okay.

Dr. Jonathan Eisenstat
March 05, 2026

MR. WATERS:  I don't have anything further. Pass the witness.

MS. CHRISTENSEN:  Okay, yeah, you can send it to us for the read and sign.

THE COURT REPORTER:  Okay.  And you would like your copy as well?

MS. CHRISTENSEN:  Yes, please.

MR. WATERS:  Anybody else on Zoom have any other follow-ups?

MR. LUZARRAGA:  No.  No, none for me.

THE COURT REPORTER:  Ms. Colao and Mr. Luzarraga, would you both like copies?

MS. COLAO:  Yes, please.

MR. LUZARRAGA:  Yes, I'll take a copy. Thanks.

THE COURT REPORTER:  Thank you.

THE VIDEOGRAPHER:  Off the record at 11:41.

(Recess taken.)

Dr. Jonathan Eisenstat
March 05, 2026

CORRECTION PAGE

WITNESS NAME:  DR. JONATHAN EISENSTAT  DATE:  03/05/2026


PAGE   LINE   CHANGE                REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

        I, DR. JONATHAN EISENSTAT, have read the

foregoing deposition and hereby affix my signature that

same is true and correct, except as noted herein.


                    _____

                    DR. JONATHAN EISENSTAT


        Before me, _____, on

this day personally appeared DR. JONATHAN EISENSTAT,

known to me or proved to me under oath or through

_____ (description of

identity card or other document) to be the person whose

name is subscribed to the foregoing instrument and

acknowledged to me that they executed the same for the

purposes and consideration therein expressed.

        Given under my hand and seal of office this

_____ day of _____, 2025.

                    SEAL:



_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____
COMMISSION EXPIRES: _____

Dr. Jonathan Eisenstat
March 05, 2026

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

CHEYANNE ADAMS, JAMES ADAMS and WENDY ADAMS,

    Plaintiffs,

V.

ZACHRY INDUSTRIAL, INC.,

    Defendant.

Civil Action No.:
5:23-cv-01437-XR

REPORTER'S CERTIFICATION
ORAL DEPOSITION OF DR. JONATHAN EISENSTAT
MARCH 5, 2026

I, Cynthia Barnsley, Certified Shorthand Reporter and Notary Public in and for the State of Texas, hereby certify to the following:

That the witness, Dr. Jonathan Eisenstat, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the original deposition transcript was delivered to Mr. Bradley Waters;

That a copy of this certificate was served on all parties and/or the witness shown herein on _____.

That the amount of time used by each party at the deposition is as follows:

    MR. WATERS:  1 hour, 16 minutes

MR. LUZARRAGA:  5 minutes

MS. CHRISTENSEN:  2 minutes

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:

Aileen Christensen
ARNOLD & ITKIN
6009 Memorial Drive
Houston, Texas 77007
TEL: (888) 493-1629
EMAIL: Achristensen@arnolditkin.com
      Jgrinnan@arnolditkin.com


FOR THE DEFENDANT UNITED RENTALS:

Natalie Colao
WHEELER TRIGG O'DONNELL LLP
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-5647
TEL: (303) 244-1800
EMAIL: Ramirez@wtotrial.com
        Colao@wtotrial.com

&

Mark Cooper
NAMAN HOWELL SMITH & LEE, PLLC
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
TEL: (210) 731-6352
EMAIL: Mcooper@namanhowell.com


FOR THE DEFENDANT ZACHRY:

Bradley Waters
ADAMS & REESE
1221 McKinney Street, Suite 4400
Houston, Texas 77010

Dr. Jonathan Eisenstat
March 05, 2026

TEL: (713) 308-0147
EMAIL: Bradley.waters@arlaw.com

FOR THE DEFENDANT INTERNATIONAL PAPER (REMOTELY):

Jose Luzarraga
BUTLER | SNOW
1400 Lavaca Street, Suite 1000
Austin, Texas 78701
TEL: (737) 802-1800
EMAIL: Jose.Luzarraga@butlersnow.com

I further certify that pursuant to FCRP Rule 30(f)(1) that the signature of the deponent was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature page contains any changes and reasons therefor.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to me by this 18th of March 2026.

Dr. Jonathan Eisenstat
March 05, 2026



Cynthia A. Barnsley, Texas CSR #8207
Texas Notary Public ID 124832903
U.S. LEGAL SUPPORT, INC.
Firm Registration No. 810
16825 Northchase Dr., Suite 800
Houston, Texas 77060